UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| ALEXIS AGUILAR,<br><br>   Petitioner,<br><br>   vs.<br><br>MATTHEW CATE, Secretary of the CDCR,<br><br>   Respondent.<br>_____ / | No. C 11-4267 PJH (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING CERTIFICATE OF APPEALABILITY** |

This is a habeas corpus case filed pro se by a state prisoner pursuant to 28 U.S.C. § 2254. The court ordered respondent to show cause why the writ should not be granted. Respondent filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the court. Petitioner responded with a traverse. For the reasons set out below, the petition is denied.

**BACKGROUND**

On August 8, 2008, a jury found petitioner guilty on count three of a four-count amended information, charging him with street terrorism, *see* Cal. Penal Code § 626.9(b). Respondent's Exhibit ("Resp. Exh.") A2 at 391. The jury deadlocked on the remaining three counts. *Id.* On February 2, 2009, prior to the retrial, the court dismissed counts two and four on motion of the District Attorney. *Id.* at 418. On February 26, 2009, a jury found petitioner guilty on count one, of first-degree murder, *see* Cal. Penal Code § 187, and found true the allegations that he committed the offense for the benefit of, or in association with a criminal street gang, *see* Cal. Penal Code § 186.22(b)(1), and that he personally used a firearm causing great bodily injury, *see* Cal. Penal Code §§ 12022.5, 12022.53(d). Resp.

Exh. A2 at 467. Petitioner waived a jury determination on the firearm enhancement for the earlier conviction on count three, *see* Cal. Penal Code § 12022.5, and the court found that allegation to be true. *Id.* at 466. On March 26, 2009, the court sentenced petitioner to an aggregate term of 56 years to life in prison. *Id.* at 513. Petitioner appealed the judgment of conviction, and while the appeal was pending, filed a state habeas petition in the Court of Appeal. Resp. Exh. B-D, E. On January 27, 2011, the California Court of Appeal affirmed the judgment and summarily denied the habeas petition. Resp. Exh. G, H. Petitioner sought review of both his direct appeal and his habeas petition in the California Supreme Court. Resp. Exh. I, K. The petition for review of his direct appeal was summarily denied by the Supreme Court on April 13, 2011, and the petition for review of his state habeas petition was summarily denied on April 20, 2011. Resp. Exh. J, L.

The facts, as described by the California Court of Appeal, are as follows:

> Jose Mexicano (Mexicano), a Sureño gang member, was released from prison and temporarily stayed with his parents in Salinas. They lived in an apartment on Acosta Plaza, a street that a local Norteño gang, Salinas Acosta Plaza (SAP), claimed as its turf.
>
> On the evening of March 4, 2007, Mexicano's 10-year-old son, Andy, was playing soccer with friends in a field near Acosta Plaza. Around 8:00 p.m., Mexicano and his father, Jose M., came home, discovered that Andy was gone, and went looking for him.
>
> Anna R., a private security guard patrolling the area, heard Mexicano yelling for Andy and then saw some boys playing. She mentioned that someone was looking for Andy. Andy heard his father whistle and ran to him. They hugged and headed back to the apartment.
>
> On their way, Andy saw a man in a grey sweater with the hood pulled over his head. He was holding his sweater up under his nose. The man crossed to the other side of the street, returned and walked behind them, and then said "Aey." Andy and his father turned around. The man told Mexicano to take off his blue Yankees hat and said Andy should leave. Andy and Mexicano ran. The man then fired five shots and fled. Andy ran back to the apartment and told Jose what had happened. Jose and his wife went to the scene and found Mexicano on the ground. Police arrived and took him to the hospital, where he was declared dead. A bullet recovered from Mexicano's chest was from a .38- or .357-caliber revolver.
>
> Andy testified that he had identified defendant from a photographic lineup that police showed him a few weeks after the incident. He said he recognized the shooter's eyes, nose, and little birthmark. Andy reconfirmed that the person he had identified was the shooter. During his direct examination, Andy was asked to look around the courtroom to see if

he could see the shooter. He said he could not. Later, however, during cross and redirect examination, Andy identified defendant as the shooter. He said he recognized defendant's eyes and birthmark. When asked to explain why he had not identified defendant in court the first time he was asked, Andy said he thought the prosecutor had told him to look in a particular part of the courtroom. Andy further testified that during a break in his testimony, he spoke to his grandmother, but she did not remind him of anything he had previously said or tell him what to say.

Daniel S. testified that he lived on Acosta Place and associated with Sureños. He knew the area was claimed by Norteños. About a half hour before the shooting, he and his friend Bryant were walking to a nearby gas station to get cigarettes and passed defendant, whom Daniel knew was a Norteño. Defendant asked Daniel if he "bang[ed]"-i.e., was in a gang. Daniel and Bryant did not stop. They bought cigarettes, and while walking back, they passed Andy, Mexicano, and defendant, who commented that smoking was bad. They continued on and then saw defendant walk between two apartment buildings. They encountered Anna, the security guard, and a few minutes later heard shots. They walked up the street and saw Mexicano on the ground. Anna called her supervisor and waited for the police.

Rey L. testified that he had associated with SAP for several years. Around 8:30 p.m. the night of the shooting, Juan L., a senior member of SAP, phoned him and said to call defendant. Rey called defendant, whose SAP moniker was Sneak. Defendant told Rey that he needed to get some "heat off ... his back," which Rey understood to mean he needed to get rid of a gun. Rey was supposed to drive his girlfriend, Jessica C., to the hospital, but instead they drove to defendant's house. Defendant seemed nervous. He retrieved something wrapped in a towel and put it in Rey's back seat. Rey then drove home, dropped off the item, and then took Jessica C. to the hospital. There, he saw the Mexicano family and got negative feelings. According to Rey, everyone knew that Mexicano was a Sureño.

Back home, Rey opened the towel and found a .38-caliber revolver. The next day, he saw defendant, who asked if Rey still had the gun. Defendant said that he had let someone "have it," which Rey understood to mean that defendant had shot someone. A few days later, Rey gave the gun to a man at a gas station. Several months later, he and defendant were in jail together, and defendant said that he would "walk" if Rey did not testify against him.

Rey admitted that on March 10, 2007, he was arrested for possessing a gun that had been used in an unrelated gang shooting on Cross Street. He agreed to help the police because he had heard that gang members were after him, and he was worried about his safety in jail. Rey falsely accused defendant of the Cross Street shooting. However, he truthfully told police that defendant was responsible for shooting Mexicano. Rey later told police that defendant had not been involved in the Cross street shooting. Thereafter, Rey's bail was reduced, and he posted it and was released.

After his release, Rey declined to help the police because he knew that

3

gangs target those who testify. Later, police searched Rey's house, found marijuana, and arrested him. This time his bail was not reduced. Rey remained uncooperative because he feared that his name would be circulated. While in jail, he was caught with more marijuana. In June 2008, he finally agreed to testify against defendant in exchange for a recommendation of lenient treatment on the marijuana charge. Rey explained that he must now remain vigilant because he cooperated with authorities. During the first trial, he and his family had been relocated for security purposes. However, because he was short of money, he returned to Salinas and was arrested for domestic violence. He later pleaded no contest to that charge.

Israel R. testified that he was a SAP member. Around the day of the shooting, someone painted a Sureño grafitti on his garage door. He called defendant, who told him to "chill." Early that evening, defendant came by. Israel was still repainting the garage door, and defendant told him to call when he was finished. When Israel called, defendant sounded out of breath as if he had been running. Israel asked why, and defendant said that someone "just got smoked in the hood." Defendant first denied being involved but later admitted being the shooter. He said he had been walking around the neighborhood "packing" a gun and encountered someone and asked his gang affiliation. When the person ran, defendant chased and shot him. A few days later, defendant told Israel that the victim had been with his young son, but he was not sure the boy had recognized him.

Israel admitted that he was arrested on August 17, 2007, and charged with attempted murder. Israel faced a possible life sentence and turned down a plea offer for 29 years, hoping for something better. In July 2008, he agreed to testify and plead to one count of assault with a gun for the benefit of his gang in exchange for a recommended sentence of 10 years 8 months. While in custody, Israel's family was relocated. At trial, he said he regretted his decision to testify. He said that his life was now in danger.

An investigation of cell phone records revealed that Israel called defendant twice at 5:17 and 5:21 p.m. Defendant called him back at 5:54. Defendant then called Juan at 6:17, 7:33, and 8:10. Defendant received calls from a blocked number at 8:19 and 8:20. Israel called defendant at 8:37. Defendant called Juan at 8:41 and 8:50. Rey called defendant at 9:15 and 9:19. Juan's phone records, which showed only outgoing calls, revealed calls to defendant at 8:55, 9:12, 9:14, and 9:20; and a call to Rey at 9:12.

Police searched defendant's house and seized, among other things, a photograph of someone wearing a memorial jacket on the back of which was stitched, "In Love And Memory Of Jose Mexicano Dec. 31, 1981-Mar. 4, 2007." Officer Bryan McKinley of the Salinas Police Department testified as a gang expert. He explained that gang members keep memorial-type memorabilia of enemies who have been killed. Officer McKinley opined that defendant's photograph constituted a "trophy" of Mexicano's killing.

***The Defense***

> Defendant's brother, Felipe, who was 13 at the time of the incident, testified that on that day, he was with defendant except for when he went to school. That evening, they were home together for the whole time. Sometime between 6:00 and 7:00 p.m., they went to Panda Express to get take-out dinner. They got back home at 8:30 p.m. At that time, defendant went to his room. Felipe said he heard defendant on the keyboard of his computer. Later, their mother called and told them about the shooting. She arrived a short time later.
>
> Defendant's mother testified that on the night of the incident, she was in her car coming home from Watsonville. She passed Acosta Plaza and learned about the shooting. She immediately called home, and Felipe told her that he and defendant were there. She thought she got home between 8:00 and 9:00 p.m. After that, she and defendant took some soup to her daughter, Jessica G., who lived nearby.
>
> Jessica G. recalled telling an investigator that her mother and defendant had come by around 9:00 p.m. However, at trial, she was not sure of the time.
>
> ***Rebuttal***
>
> Detective Gerry Davis of the Salinas Police Department testified that the computer seized from defendant's room had been used around 4:00 p.m. and not again until after 10:54 p.m.
>
> Investigator Coletti testified that cell phone records from defendant's mother's phone revealed that she called her home at 9:35 p.m.

Resp. Exh. G at 2-7 (footnotes omitted).

## STANDARD OF REVIEW

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the

first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000). Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court precedent. *See Ylst,* 501 U.S. at 804-06.

**DISCUSSION**

As grounds for federal habeas relief, petitioner asserts that: (1) his Sixth and Fourteenth Amendment rights were violated by the exclusion of certain expert testimony; and (2) trial counsel was ineffective for failing to object to the prosecutor's misconduct in closing argument. Petition for Writ of Habeas Corpus ("Hab. Pet.") Exhibit ("Exh.") A.

**I.   Expert Testimony**

Petitioner claims that the court's exclusion of expert testimony concerning eyewitness identification violated his constitutional rights. Hab. Pet. Exh. A at 31.

### A. Factual Background

#### i. Trial Proceedings

Prior to trial, the defense filed a brief disclosing its intent to present the expert testimony of Dr. Richard Shomer regarding the psychological factors that affect the accuracy of eyewitness identifications. Resp. Exh. A1 at 182. The prosecution filed a motion in limine seeking to exclude his testimony, arguing that it was unnecessary because the challenged eyewitness's testimony was sufficiently corroborated. *Id.* at 253-258. The court initially granted the motion, but revisited the issue at the close of the prosecution's case in chief. Resp. Exh. A2 at 326, M5 9720-33. After hearing further argument regarding admission of Dr. Shomer's testimony, the court exercised its discretion to exclude the defense expert. Resp. Exh. M5 at 9732-33.

#### ii. California Court of Appeal Opinion

On direct appeal, petitioner argued that the trial court erred in excluding the proposed testimony of the defense expert. Resp. Exh. G at 7. The Court of Appeal acknowledged that generally, under California law, expert testimony explaining different factors affecting the accuracy of an eyewitness identification cases is appropriate in certain cases. *Id.* at 8-9; *see People v. McDonald*, 37 Cal. 3d 351, 369 (1984). However, the court also emphasized that the decision to admit or exclude expert testimony is a matter that is primarily within the trial court's discretion and, in most cases, an appellate court should defer to the trial court's discretion in order to prevent a flood of unnecessary evidence on the subject. Resp. Exh. G at 9. The court noted that expert testimony was appropriate "when an eyewitness identification of the defendant is a key element of the prosecution's case `but [the identification] is not substantially corroborated by evidence giving it independent reliability." Resp. Exh. G at 9 (citation omitted). In such cases it would be error to exclude qualified expert testimony when the defendant offers it to show the existence of specific psychological factors that could have affected the accuracy of the

identification but are not likely to be fully known to or understood by the jury. *Id.* at 9-10.

The Court of Appeal concluded that this was not such a case. Here, petitioner was initially identified from a photographic lineup by the victim's son, Andy, a few weeks after the incident, and Andy repeated the identification during trial. *Id.* at 11. The Court of Appeal found substantial evidence corroborating Andy's identification and independently linking petitioner to the shooting. *Id.* Specifically, the court relied on the following evidence: Petitioner was observed by another witness, Daniel, in the vicinity of the shooting immediately before it happened; two other witnesses, Rey and Israel, testified that petitioner admitted to shooting the victim; Rey further testified that he disposed of a .38 or .357 caliber revolver for petitioner, which matched the bullet that was recovered from the victim's body; Israel also testified that petitioner was out of breath when they spoke, and that he stated the victim had been with a young boy; cell phone records indicated that petitioner made calls to Rey, Israel and another gang member, Juan, shortly after the shooting; petitioner had a trophy photograph[1] of an unknown individual wearing a memorial jacket to the victim; and Rey stated that petitioner, when they were in jail together on unrelated charges several months after the incident, implicitly told him not to testify. *Id.* at 11-12. In light of the substantial amount of evidence incriminating petitioner and corroborating the identification, the Court of Appeal determined that the trial court did not abuse its discretion by excluding the expert testimony. *Id.* at 12.

Petitioner argued that, because Rey and Israel both received favorable treatment in their own criminal cases in exchange for their cooperation, their testimony was too unreliable to corroborate Andy's identification. *Id.* The Court of Appeal rejected this argument, finding that Rey and Israel's testimony was not the only evidence linking petitioner to the shooting, and the fact that their testimony was subject to impeachment did not render it insufficient to corroborate Andy's identification, but instead added to the cumulative circumstantial evidence corroborating the identification. *Id.* at 12-13.

---

[1] Gang members often keep memorial-type memorabilia as a trophy of their enemies who have been killed. Resp. Exh. M7 at 9982.

8

The Court of Appeal concluded that even if the trial court did err by excluding the expert testimony, any error was harmless because it was not reasonably probable that petitioner would have obtained a more favorable result had the expert testified. *Id.* at 13.

### B. Legal Standard

"[F]ederal habeas corpus relief does not lie for errors of state law." *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) *quoting Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *See Estelle*, 502 U.S. at 67-68.

Even if it is proper to admit expert testimony on eyewitness identification under certain circumstances, there is no federal authority recognizing a constitutional right that such testimony must be admitted. *See United States v. Langford*, 802 F.2d 1176, 1179 (1986). The trial court has broad discretion to conclude that the jury would not benefit from admission of the proffered evidence, and the exclusion of such testimony has repeatedly been upheld in this Circuit. *Id.* (citations omitted).

### C. Discussion

Petitioner argues that exclusion of the expert testimony violated his right to due process. Hab. Pet., Exh. A at 12. This claim lacks merit. The exclusion of Dr. Shomer's testimony did not deprive petitioner of a meaningful and fair opportunity to present a defense, as he was still able to vigorously attack Andy's identification and effectively argue to the jury the factors that made the identification inaccurate and unreliable. Resp. Exh. M8 at 10287-10296. Moreover, petitioner took full advantage of the opportunity to cross-examine the adverse witnesses linking petitioner to the shooting, and was able to direct the jury's attention to the reasons why those individuals had powerful motives to lie. *Id.* at 10297-10311. This was not a case where expert testimony would have cast doubt on the reliability of the identification. The proffered testimony concerned matters of identification that were within the jury's common sense, and defense counsel effectively

9

focused their attention on those critical issues through his cross-examination and in his closing argument. In this instance, the expert testimony would have been cumulative and of practically no benefit to the jury, therefore its exclusion was reasonable under the circumstances.

### D. Conclusion

The California Court of Appeal's determination that the trial court acted within its discretion by excluding the expert testimony was not contrary to, or an unreasonable application of, clearly established Supreme Court authority. *See* 28 U.S.C. § 2254(d).

## II. Ineffective Assistance of Counsel

Petitioner contends that the prosecutor committed misconduct by diminishing and trivializing the reasonable doubt standard, and that his counsel was ineffective for failing to object to this misconduct. Hab. Pet., Exh. A at 49, 53.

### A. Factual Background

On direct appeal, petitioner argued that the prosecutor's powerpoint presentation, presented through a puzzle of the Golden Gate Bridge, improperly quantified the reasonable doubt standard by suggesting that this standard of proof could be satisfied even if there were large gaps and inconsistencies in the evidence; and that the use of the puzzle trivialized the reasonable doubt standard by likening the entire deliberative process to a simple guessing game. Resp. Exh. B at 39-40. The Court of Appeal found that petitioner forfeited any claim of prosecutorial misconduct by failing to contemporaneously object to the prosecutor's rebuttal presentation. Resp. Exh. G at 13-14. The court also rejected petitioner's claim of ineffective assistance of counsel based on the failure to object, concluding that counsel's performance was not deficient because the decision not to object to the alleged prosecutorial misconduct was inherently tactical; and, in any case, the record failed to establish prejudice. *Id.* at 14-15.

### B. Legal Standard

In order to succeed on an ineffective assistance of counsel claim, the petitioner must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687

10

(1984), which requires him to show deficient performance and prejudice. Deficient performance requires a showing that trial counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003). To establish prejudice, petitioner must show a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Strickland*, 466 U.S. at 694. If a petitioner cannot establish that defense counsel's performance was deficient, it is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test. *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

**C. Discussion**

Petitioner claims, as he did on direct appeal, that the prosecutor's powerpoint presentation mischaracterized and trivialized the reasonable doubt standard. Hab. Pet., Exh. A at 49. Specifically, petitioner contends that: (1) the prosecutor's argument suggested to the jurors that they could base their verdict on a single piece of evidence, or upon less than half the evidence, so long as they could make a reasonably good guess that petitioner was the perpetrator, regardless of any unresolved inconsistencies; and (2) the prosecutor trivialized the reasonable doubt standard by reducing the deliberative process to a simple guessing game. *Id.* at 53.

During his rebuttal argument, the prosecutor discussed the reasonable doubt standard using a powerpoint presentation, beginning with one puzzle piece, then filling in the remaining pieces of the puzzle, and ultimately revealing a picture of the Golden Gate Bridge. Resp. Exh. M8 at 10324. The prosecutor likened each piece of evidence in the case to a piece of the puzzle, stating that it was up to each individual juror to determine how many pieces of the puzzle were necessary before they could find proof beyond a reasonable doubt. *Id.* at 10326. The prosecutor then touched upon the key pieces of evidence in greater detail, arguing how each item of evidence uncovered another piece of the puzzle, ultimately revealing petitioner as the killer. *Id.* at 10326-10332.

Under California law, the prosecutor arguably committed misconduct by using a

powerpoint presentation in this manner.  *See People v. Katzenberger*, 178 Cal. App. 4th 1260, 1265 (2009) (finding that the prosecutor committed misconduct in closing argument by using a slide show that depicted an eight-piece puzzle picture of the Statue of Liberty with two pieces missing, to illustrate the reasonable doubt standard).  However, whether the prosecutor actually committed misconduct is beside the point.  The question presented to the state court was whether trial counsel's failure to object to the alleged misconduct constituted ineffective assistance of counsel, and the court answered that question in the negative.  Thus, this court's resolution of the matter depends on whether the state court's decision finding neither deficient performance nor prejudice from counsel's failure to object was an unreasonable application of the *Strickland* standard.  *See Harrington v. Richter*, 131 S. Ct. 770, 785 (2011).

        The court agrees with the state court's determination that counsel's failure to object to the prosecutor's rebuttal presentation does not constitute deficient performance.  Even though the prosecutor's entire powerpoint presentation was arguably improper, counsel's strategic decision not to object represents a reasonable tactical choice.  Although the record does not reveal why counsel made this decision, there could be numerous reasons for counsel not to object.  For instance, counsel may not have wanted to call undue attention to the presentation, risk focusing the jury's attention on damaging evidence, or appear overly argumentative.  "There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect."  *See Harrington*, 131 S. Ct. at 790 (citations and internal quotation marks omitted).  "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. ... [a]ny such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions."  *See Strickland*, 466 U.S. at 688-89.  Further, even if the argument was improper, any potential harm that may have resulted from the prosecutor's presentation was cured by the court's instructions on the reasonable

12

doubt standard, and that statements made by the parties are not evidence. *See Fields v. Brown*, 503 F.3d 755, 787 (9th Cir. 2007) (jurors are presumed to follow the trial court's instructions). Viewing the record in its entirety, counsel's decision not to object to the prosecutor's powerpoint presentation was not objectively unreasonable.

In any case, even if the court assumes that counsel's performance was deficient, petitioner fails to demonstrate that he was prejudiced by trial counsel's failure to object. The victim's son positively identified petitioner as the shooter, and another witness placed petitioner at the scene shortly before the shooting. Resp. Exh. G at 3-4. Additionally, petitioner admitted his crime to two witnesses, one of whom disposed of the murder weapon for him, and cell phone records indicated that petitioner spoke to both witnesses shortly after the shooting. *Id.* at 4-6. Although both witnesses entered cooperation agreements with the prosecution, the jury was aware of their motive to lie and was able to assess their credibility accordingly. In view of the substantial evidence presented at trial, there is not a reasonable probability that the result of the proceeding would have been different had counsel contemporaneously objected to the prosecution's rebuttal presentation. *See Strickland*, 466 U.S. at 694.

### D. Conclusion

Accordingly, the state court's determination that petitioner was not denied the effective assistance of counsel was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. *See* 28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 687.

## III. Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in the ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009).

To obtain a COA, petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the

13

constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Section 2253(c)(3) requires a court granting a COA to indicate which issues satisfy the COA standard. Here, the court finds that both issues presented by petitioner in his petition meet the above standard and accordingly GRANTS the COA as to those issues. *See generally Miller-El*, 537 U.S. at 322. The issues are:

(1) whether the trial court violated petitioner's constitutional rights by excluding expert testimony on eyewitness identification; and

(2) whether trial counsel was ineffective for failing to object to the prosecutor's misconduct in closing argument.

Accordingly, the clerk shall forward the file, including a copy of this order, to the Court of Appeals. *See* Fed. R. App. P. 22(b); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th Cir. 1997).

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is **DENIED**.

A Certificate of Appealability is **GRANTED**. *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: April 26, 2013.

PHYLLIS J. HAMILTON
United States District Judge

G:\PRO-SE\PJH\HC.11\AGUILAR4267.HC.wpd